Filed 2/11/14  P. v. Rojas CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037357 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1066876) |
| v. | |
| DOMINGO SANTOS ROJAS, et al., | |
| Defendants and Appellants. | |

A jury found appellant Domingo Rojas (Domingo) and co-appellant Rene Rojas (Rene)[1] each guilty of one count of shooting at an occupied motor vehicle (Pen. Code, § 246, count one),[2] three counts of assault with a semiautomatic firearm (§ 245, subd. (b), count two victim Efrem Mendoza, count three Noel Mendoza, count four Delia Campos Esquival), and one count of carrying a loaded firearm in a vehicle by a person not the registered owner (§ 12031, subd. (a)(1), count five).[3]  The jury found Domingo guilty of one count of giving a false name to a peace officer (§ 148.9, count six).

As to Domingo, the jury found true the following allegations; that count one was committed for the benefit of a criminal street gang within the meaning of section 186.22,

---

[1]     We refer to the appellants in this case by their first names for ease of reading.  No disrespect is intended.

[2]     All unspecified section references are to the Penal Code.

[3]     Effective January 1, 2012, this section was reenacted without substantive change as section 25850.  (Stats. 2010, ch. 711, § 6, operative Jan. 1, 2012.)

subdivision (b)(4);[4] and that Domingo personally and intentionally discharged a firearm (§ 12022.53, subd. (b) & (c)); that counts two, three and four were committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C), and that Domingo personally used a semiautomatic firearm (§ 12022.5, subd. (a)); and that count five was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(A).

As to Rene, the jury found true the allegation that count one was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(4); and that counts two, three and four were committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(B), and Rene was armed with a semiautomatic firearm (§ 12022, subd. (a)(1)); and that count five was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(A).

The trial court sentenced Domingo to an indeterminate term of 35 years to life, consisting of 15 years to life on count one (shooting at an occupied vehicle) for the benefit of a criminal street gang, plus 20 years to life for personally and intentionally discharging a firearm. The court imposed a concurrent term of 20 years to life on count three (assault with a semi automatic firearm) and the same term on count four. The court stayed a 20-year term on count two (assault with a semi automatic firearm) pursuant to section 654, plus a concurrent term of five years for count five (carrying a loaded firearm in a vehicle by a person not the registered owner).[5]

---

[4] As we shall explain later, section 186.22, subdivision (b)(4) uses the phrase "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." We abbreviate this to "for the benefit of a criminal street gang." Subdivision (b)(1) of section 186.22 uses the same language.

[5] As to count six, the misdemeanor, the court imposed a six month concurrent term, but deemed the sentenced served.

As to Rene, the court sentenced him to 15 years to life consisting of 15 years for count one. The court imposed but stayed pursuant to section 654 an eight year prison term for count two, the court imposed a concurrent term of eight years for count three and the same for count four and imposed a concurrent term of three years four months for count five. The court imposed but stayed one year firearm enhancements attached to counts two, three and four.

As to both appellants the court imposed various fines and fees and awarded credit for time served.

Domingo filed a notice of appeal the same day he was sentenced, August 26, 2011, and again on September 1, 2011. Rene filed a notice of appeal on September 19, 2011.

On appeal, both appellants raise various challenges to the evidence at trial and assert that their constitutional rights were violated by the admission of certain gang evidence. We will detail these challenges as we discuss them. For reasons that follow, we affirm the judgment as to Domingo, but modify the judgment as to Rene.

<em>Evidence Adduced at Trial</em>

At the outset, we note that witnesses gave slightly different accounts of what happened. However, we are required to set forth the evidence in the light most favorable to the judgment. (*People v. Valencia* (2002) 28 Cal.4th 1, 4, overruled in part on other grounds in *People v. Yarbrough* (2012) 54 Cal.4th 889, 894.)

Just after midnight on July 17, 2010, Noel Mendoza, his uncle Efrem Mendoza, and Efrem's[6] girlfriend Delia Campos stopped at the 7-Eleven store located near the intersection of Story Road and Hopkins Drive in San Jose. According to the

---

[6] We refer to Noel Mendoza and Efrem Mendoza by their first names to avoid confusion and for ease of reading. Again, no disrespect is intended.

3

prosecution's gang expert, Officer Montoya,[7] this intersection straddles established Norteño and Sureño gang territory.

Noel, Efrem and Ms. Campos were traveling in Efrem's truck as part of a car club; the club has an interest in luxury trucks. According to Efrem, there were five trucks that were present at the 7-Eleven and approximately 10 club members. When Noel and Efrem arrived at the 7-Eleven they noticed a truck that had "nice rims" already parked there.[8] Noel testified that he saw three people come out of the 7-Eleven and get into this black truck; Efrem testified that there were two people in the black truck and a third person came out of the store and got into the black truck; ultimately, Noel and Efrem agreed that there were three occupants of the black truck. According to Noel, the driver of the black truck was "looking at us like a mugging," which he explained meant giving him a "bad look." Efrem testified that the rear passenger in the black truck glared at them; he described this glare as "a really bad stare" and "mad dogging."

The three men in the black truck drove off; as the truck was leaving Efrem saw the back seat passenger put his hand out of the window and "throw a number" at him. Efrem described what he saw as a "gang sign"; in court he demonstrated what he saw by extending his hand and holding up three fingers while his index finger and thumb touched each other. After the event, he told Officer Montoya that the sign he saw represented a "13." On cross examination by Domingo's counsel, Efrem reiterated that he saw a "13." Detective Montoya testified that holding up three fingers is the Sureño gang's "sign and symbol."

Efrem, Noel and Ms. Campos testified that the black truck reappeared near the 7-Eleven. The truck ran a red light, did a U-turn and pulled back into the parking lot of the

---

[7]     Officer Montoya is referred to as Detective Montoya and Officer Montoya throughout the trial transcript. For the sake of consistency, we refer to him as Officer Montoya.

[8]     We refer to this truck as the "black truck" to differentiate it from Efrem's truck.

4

7-Eleven; this was approximately three minutes after the truck had driven away. The black truck drove past the group of car club members and stopped. Noel saw the driver of the black truck "mugging" them again.

When the black truck returned to the parking lot Efrem's truck was still parked in the same place, but he was getting ready to leave. Efrem testified that at the time he had "a bad feeling." The occupants of the black truck were looking at him in an unfriendly way. Efrem started to leave the parking lot. As he did so he saw the front seat passenger in the black truck point a gun out of the window and toward his truck. According to Noel, Efrem yelled " 'Get down. They have a gun.' " Efrem threw his truck into reverse and backed up. Multiple gunshots rang out with one bullet hitting the side of Efrem's truck.[9] Efrem testified that he "could see the nails come out of the shimmer." The black truck drove away with its headlights turned off; Efrem followed in his truck.

Officer Ashley Waeger was driving along Story Road in her marked patrol car at around 12:45 a.m. on January 17, 2010, when she heard gunshots. Officer Waeger looked to her left and saw a black truck leaving the parking lot of the 7-Eleven; she saw that the front passenger had his arm out of the window and was holding a black semi-automatic handgun. She saw the gun being discharged. Officer Waeger was able to see the front passenger's face clearly. She noticed the shooter's head turned in her direction and then the arm and gun went into the truck; the truck sped off. Officer Waeger made a U-turn at the intersection of Story and Hopkins and followed the truck. Officer Waeger saw at least three other trucks leaving the 7-Eleven parking lot. Officer Waeger notified dispatch of the situation as she followed the black truck at well over the speed limit. Officer Waeger identified Domingo as the shooter.

---

[9] Efrem testified that he heard five or six shots; Noel testified that he heard four shots, and Ms. Campos said she heard "a lot" of gun shots.

Subsequently, the black truck was stopped at the intersection of Story Road and Capitol Avenue by several officers. The driver said that his name was Pedro Herrera.[10] He had an empty handgun ammunition magazine in his pocket. A New Orleans Saints football jersey was stretched over the driver's seat of the truck.

A search of the black truck revealed a .45-caliber semiautomatic pistol in the front seat with a round still in the chamber and a spent shell casing. An officer located spent .45 caliber shell casings at the scene of the shooting that were consistent with gunfire from a semiautomatic weapon. A subsequent ballistics analysis showed that the shell casings in the truck and those in the parking lot had been fired from the pistol recovered from the black truck.

Domingo gave officers a false name and date of birth when he was arrested.

Officers determined that Rene was the rear passenger in the vehicle. He had a blue bandana on his person when he was arrested for being drunk in public. When he was arrested for the crimes alleged in this case, the arresting officers took possession of his cellular telephone. The telephone had the letters "SSP" etched on it.

A gunshot residue test detected particulates consistent with gunshot residue on both Domingo and Rene.

Officer Montoya testified generally about prison gangs and their relationship to the criminal street gangs the Norteños and Sureños and their subsets in San Jose. Officer Montoya told the jury that the Sureños are a Hispanic criminal street gang; they associate with the color blue and the number 13. Sureños are rivals of the Norteños; the Norteños associate with the color red and the number 14. The victims in this case were Hispanic. A Sureño custom is to extend one finger on one hand and three fingers on the other hand to convey the gang's "13" logo. When Sureño gang members compose text or written messages or graffiti they commonly cross out the letter "N" and replace it with a "3" or an

---

[10]     It appears that Mr. Herrera fled to Mexico sometime before trial.

"E" as a sign of disrespect for their rivals the Norteños. The Sureños' primary activity is to commit "assaults with deadly weapons," robberies, and "drive by shootings." In Officer Montoya's experience, the Sureños engage in these activities consistently and repeatedly. He estimated that there were at least a thousand Sureño gang members in the San Jose area.

Officer Montoya explained to the jury that neighborhood-based subsets of the Sureños exist throughout San Jose. One of the largest subsets is centered in west San Jose; it is known as Sur Santos Pride (SSP) and has approximately 100 members. SSP exists under a formal chain of command with the prison gang the Mexican Mafia as the figure head of the organization. SSP uses the fleur de lis as a symbol and the New Orleans Saints football apparel; Sureño gang members commonly carry or wear a blue bandana. Gang members on San Jose's west side make a three-prong hand signal to represent the letter W for west. In his experience, Officer Montoya had found that Sureños from various San Jose subsets commonly associate with each other. Another San Jose Sureño gang is known as Vario Locos Trece (VLT). The place where the shooting took place was situated between VLT and rival Norteño territories.

According to Officer Montoya, gang members challenge perceived rivals by asking about or "checking" their allegiance, engaging in hostile staring, known as "mugging," or by flashing a gang sign. Officer Montoya explained that mugging or "mean mugging," sometimes known as "mad dogging," is where a gang member stares "not in a polite way," but in rather an "aggressive way," as "some sort of a challenge." In gang encounters, the situation may escalate into acts of violence involving firearms. In these encounters, a gang member experiences pressure from his associates to use weapons in the conflict; gang members are expected to be willing to commit violent criminal acts in order to maintain credibility and standing within the gang. In assessing whether someone is a rival gang member, an opposing gang member would look at the colors the potential rival is wearing, hairstyles, tattoos and types of clothing; in Officer

7

Montoya's experience, violent assaults often follow. Even the act of shooting at a person or group—none of whom are in a rival gang—enhances the notoriety and reputation of the shooter's gang.

Officer Montoya opined that Rene was a Sureño gang member in the SSP subset. He formed this opinion based on Rene's association with other Sureño gang members and on certain things that he found in Rene's cellular telephone. In particular, Officer Montoya relied on the following information, some of which was documented on police department field interview cards, other records of police contacts, and his personal investigation of gang crimes:

- In 2007, San Jose police contacted Rene in SSP territory; he was wearing clothing consistent with gang membership.

- Rene had SSP inscribed on his cellular telephone.

- Rene's association with Arturo Santos: In 2008, an officer from the Violent Crimes Enforcement Team—the gang suppression unit—made a "vehicle stop" and "queried" the names Arturo Santos and Rene Rojas.[11] According to field identification cards, Arturo Santos had been stopped in a gang area with a cellular telephone that contained gang symbols and signs. Based on this, Officer Montoya opined that Arturo Santos was a Sureño.

- Rene possessed a blue bandana at the time of his arrest for being drunk the night of the shooting.

- The contact list in Rene's cellular telephone included many names in which the letter E had be changed to the number 3; multiple names in the contact list included gang monikers including "Trigger," "Dreamer," "Goofy," "Sad Eyes,"

---

[11]     Officer Montoya explained that he reviewed the printout from the department's computer aided dispatch system (CAD printout) and noticed that the officer who made the vehicle stop had asked dispatch to check the names Arturo Santos and Rene Rojas in association with the vehicle stop.

"Psycho," "Smiley," "Bullet," "Spider," "Temper" and "Sneaky"—some of these names had the notation SSP next to them. Officer Montoya recognized "Temper" as being Jorge Cortez, a known SSP gang member who had been involved in an SSP assault—a case that Officer Montoya personally investigated.

- Text messages in Rene's cellular telephone that included a "signature" with gang indicia consistent with Sureño membership. Several incoming text messages referenced SSP. Multiple photographs stored on the telephone showed Rene with another man wearing clothing and displaying hand signs consistent with Sureño membership; another photograph displayed San Jose gang symbolism and yet another photograph depicted "Tweety Bird" with Sureño gang colors and symbols.

- The circumstances of the current crime including the hand gesture that Rene made, the blue bandana, the New Orleans Saints jersey, and the fact that the front seat passenger "shot at a perceived rival."

Officer Montoya noted that a person wearing a red shirt and red shoes was present in the parking lot when the shooting occurred—clothing that would have been perceived by the shooter as indicting the presence of Norteños.

Officer Montoya identified Pedro Herrera, the driver of the black truck, as an associate of the Sureño gang; he based this opinion on the fact that he had an established relationship with Rene and the facts of the case. Further, San Jose Police Department records documented a relationship between Rene and Pedro Hererra in 2008 and Rene's telephone number and photograph were in Hererra's telephone.

Officer Montoya stopped short of identifying Domingo as a gang member, but opined that he was an associate based on his conduct in this case in which he was in a truck that contained gang indicia (the Saints jersey), the driver positioned the truck to allow Domingo to shoot at the perceived rivals to the Sureño gang, and an SSP member was in the back of the truck and had just thrown a gang sign. Officer Montoya told the jury that the attack was done in a manner consistent with gang aggression; that is, after a

9

gang sign is flashed and the rivals do not leave immediately, an attack is more likely to occur so that the gang gains respect.

Officer Montoya explained that a gang committing a violent assault in public is a way of displaying strength, power and territorial dominance. He opined that the shooting benefitted SSP by increasing the notoriety of the Sureños; and possession of a loaded handgun in a vehicle would benefit the Sureños because "guns are a tool of the trade."

Officer Montoya opined that the factors that could have created the perception that the victims in this case were Norteños included the following: some people in the car club were wearing red clothing, the group was made up of young Hispanics in their 20's and 30's and the location of the attack was in an area frequented by gang members.

The prosecutor asked Officer Montoya to describe what makes a gang a criminal street gang. Officer Montoya responded that it is "when they commit crime." Specifically, he explained that under California law a gang is considered a criminal street gang "[w]hen their principal activity is to commit a crime and specifically their members . . . ." As to whether a gang has to have a certain number of members, he explained that by definition they have to have three or more members; that the organization can be formal or informal, and they have to be ongoing and need some sort of name or identifying symbol. The prosecutor asked if it was his opinion that the Sureños were a criminal street gang under that definition. Officer Montoya responded that they were. The prosecutor asked Officer Montoya about the "primary activity" part of the definition, specifically, as to whether there is a "list of crimes that have to be committed or can it just be any crime?" Officer Montoya explained that there are 33 enumerated crimes. When asked for his opinion on SSP, Officer Montoya opined that they were part of the Sureño criminal street gang. The prosecutor asked whether the Sureños were an ongoing organization, to which Officer Montoya explained they were because they have a pattern of criminal gang activity.

10

As noted *ante*, Officer Montoya opined that Sureños have consistently and repeatedly engaged in a pattern of criminal activity, specifically, assaults with deadly weapons, robbery, and shooting at occupied vehicles or drive by shootings. He opined that these crimes were the chief or principal activities of the Sureños. He based his opinion on reading police reports, speaking with other officers and assisting them in their investigations.

The jury received the conviction records[12] for Pedro Pedrisco and Jorge Arellano. Both men pleaded no contest to robbery in 2008 and admitted the truth of the section 186.22, subdivision (b) gang enhancements. Officer Montoya described the facts of the case that involved Pedrisco and Arellano, based on the police reports written by another gang detective. Pedrisco and Arellano were Sureño gang members, with Arellano belonging to SSP. They robbed a pedestrian of his red shorts while the pedestrian was walking through SSP territory in September 2007. Officer Montoya's opinion that Pedrisco was a Sureño gang member was based on two contacts with other police officers, one wherein he admitted his gang membership and one wherein his gang tattoo was documented. Officer Montoya's opinion that Arellano was an SSP member was based on another detective's report referencing three admissions to belonging to SSP as well as documentation of him wearing Sureño gang clothing and having a Sureño tattoo.

The prosecution introduced conviction records for Jorge Cortez that showed that Cortez pleaded no contest in 2008 to two counts of assault with a deadly weapon and admitted gang allegations. Officer Montoya assisted in the investigation in this case; he based his description of the facts on a review of the crime report and photographs that were taken. In 2008, Cortez committed a knife attack in the company of several other

---

12    All the conviction records that were admitted into evidence in this case were certified records of conviction. All were admitted without objection except that Rene's counsel requested that the sentencing sheets be redacted to obscure the sentence imposed; the court granted the request.

11

SSP members. The facts of the case, as well as photographs of Cortez's gang tattoos contributed to Officer Montoya's opinion that Cortez was an SSP member. The photographs were received as evidence without objection.

The prosecution introduced a record of the conviction for Gonzalo Rodriguez. In 2008, Rodriguez pleaded guilty to six counts of robbery. Officer Montoya assisted the police department's robbery unit in investigating the case. The robbery detectives interviewed Rodriguez regarding a series of six robberies involving Asian ladies, and he admitted his participation in the robberies that were carried out by a juvenile. Rodriguez admitted to the robbery detectives that he was an SSP gang associate. During the investigation Rodriguez's girlfriend told the gang detectives that Rodriquez was an SSP gang member and there were images on the juvenile's cellular telephone that were indicative of SSP membership. Based on the facts of the case, Rodriguez's admissions to the robbery detectives and to Officer Montoya, and the fact that Rodriguez had gang tattoos on his body, Officer Montoya opined that Rodriguez was an SSP member.

Conviction records for Jorge Cisneros, Mario Gonzalez, and Jairo Navarro were received into evidence. In 2006, all three men pleaded no contest to robbery and admitted the truth of related gang enhancements. Officer Montoya relied on a report written by another gang detective to describe the facts underlying that case. In 2005, the three men and four known SSP members assaulted and robbed a man they suspected of being a Norteño in SSP territory. Police documentation that showed that the men had gang tattoos and had admitted that they were SSP gang members contributed to Officer Montoya's opinion that they were SSP gang members.

Finally, the prosecution introduced conviction records for Diego Arreguin and George Natareno. In 2009, Arreguin pleaded no contest to battery causing great bodily injury, exhibiting a deadly weapon, and assault with a deadly weapon and admitted the truth of gang enhancements on two of the counts. Natareno pleaded no contest to two counts of assault with a deadly weapon and one count of battery causing great bodily

12

injury; he admitted the truth of corresponding gang enhancements.  Officer Montoya was the investigating officer in this case and he described how in August 2008 the two men participated in a gang attack on three victims.  Officer Montoya opined that both Arreguin and Natareno were Sureño gang members based on their admissions, tattoos and past admissions.

The court instructed the jury that they were to determine the meaning and importance of the expert's opinion by considering in part "whether the information on which the expert relied was true and accurate."

Since many of Domingo's and Rene's arguments on appeal pertain to the gang expert's testimony we set forth the law as it pertains to gang enhancements and what the prosecution must prove.

The California Street Terrorism Enforcement and Prevention Act (the STEP Act; § 186.20 et seq.) criminalizes active participation in a criminal street gang and the commission of other crimes for the benefit of, at the direction of, or in association with a criminal street gang.  (§ 186.22, subds. (a) & (b).)

"A criminal street gang is any ongoing association that has as one of its primary activities the commission of certain criminal offenses and engages through its members in a 'pattern of criminal gang activity.'  [Citations.]  A pattern of criminal gang activity is 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' specified criminal offenses within a certain time frame, 'on separate occasions, or by two or more persons' (the 'predicate offenses').  [Citations.]"  (*People v. Tran* (2011) 51 Cal.4th 1040, 1044.)  Both the current effective version and prior versions of section 186.22, subdivision (e) list a number of specific offenses that qualify as predicate offenses.  Included in that list are "(1) Assault with a deadly weapon or by means of force likely to produce great bodily

injury, as defined in Section 245.  [¶]  (2) Robbery . . . .  [¶]  (5) Shooting at an inhabited dwelling or occupied motor vehicle . . . ."  (§ 186.22, subd. (e).)[13]

Thus, the prosecution in this case had to prove not only that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members  (§ 186.22, subd. (b)(1)), but in addition had to "prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period.  [Citation.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).)

---

[13]    Subdivision (b) of section 186.22 provides "(1) Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows:  [¶]  (A) Except as provided in subparagraphs (B) and (C), the person shall be punished by an additional term of two, three, or four years at the court's discretion.  [¶] (B) If the felony is a serious felony, as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of five years.  [¶]  (C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years.  . . .  [¶]  (4) Any person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment . . . ."  Shooting at an occupied vehicle is one such felony.  (§ 186.22, subd. (e)(5).)

14

*Discussion*[14]

*I. Ineffective Assistance of Counsel-Seizure of Rene's Cellular Telephone*

After Rene was arrested for the crimes in this case, as noted, the police seized his cellular telephone. At the preliminary hearing, Officer Montoya testified that five pages of photographs and graphics found on the telephone contributed to his opinion that Rene was a member of the Sureños and SSP. During an Evidence Code section 402 hearing, Officer Montoya again cited the evidence on the telephone to opine that Rene was a gang member.

Rene's trial counsel did not file a section 1538.5 motion to suppress the evidence seized from the telephone. Nor did he move to have the evidence excluded when the court heard motions in limine on August 30, 2010, nor during Evidence Code section 402 hearings held on August 31, 2010, and September 9, 2010.

On September 29, 2010, during approximately the fourth week of trial, the prosecutor expressed his intent to introduce some of the evidence contained in the memory of Rene's cellular telephone. [15] Rene's counsel objected to the cellular telephone evidence for the first time on two grounds—foundation and relevance. Counsel told the court that he was not making a section 1538.5 motion. The court stated that it thought a "1538.5 section A is square-on as it relates to the search issue of which may or may not be valid, but the timing is improper."[16] The court found that the

---

[14]     We discuss appellants' contentions in a different order than they have them designated in their opening briefs.

[15]     Specifically, the evidence in question included electronically stored names in which the letter "e" had been changed to a "3," the presence of "SSP" as a notation following some names and in text messages, listings for people identified by purported gang monikers, uses of the "sign off code" using the number 13, photographs consistent with membership in a particular gang, and the records of calls with Jose Cortez, "another SSP member."

[16]     Section 1538.5 provides, "(a)(1) A defendant may move for the return of property or to suppress as evidence any tangible or intangible thing obtained as a result of a search

15

opportunity to bring the 1538.5 motion "plainly existed" at the preliminary hearing and the "multiple day 402 hearing." The court went on to say, "We are [in an] extensive part of Officer Montoya's testimony related to these items and images. The opportunity to bring the motion has come and gone. [¶] We're late in a trial that is already running late, and it is plainly a motion to suppress - - however, you want to label it, so the objection as to relevance and to authentication and foundation are well timed, but overruled, and I am finding the Fourth Amendment issue to be untimely."

Rene asserts that his right to the effective assistance of counsel was violated because trial counsel failed to make a section 1538.5 motion to suppress the "illegally seized cell phone evidence used to prove" that he was a gang member.[17]

"To prevail on a claim of ineffective assistance of counsel, a defendant ' "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." ' [Citation.] A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was

_____

or seizure on either of the following grounds: [¶] (A) The search or seizure without a warrant was unreasonable. . . . [¶] (f)(1) If the property or evidence relates to a felony offense initiated by a complaint, the motion shall be made only upon filing of an information, except that the defendant may make the motion at the preliminary hearing . . . . [¶] (h) If, prior to the trial of a felony or misdemeanor, opportunity for this motion did not exist or the defendant was not aware of the grounds for making the motion, the defendant shall have the right to make this motion during the course of trial."

[17]     Domingo joins in this issue and argues that he had a reasonable expectation of privacy to be protected in the event that Rene seeks suppression of such evidence based on the presence of his name and cellular telephone number in Rene's cellular telephone data base. He recognizes, however, that that expectation of privacy is not adequate for him to seek suppression of the cellular telephone evidence in his own right.

asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. [Citation.] Moreover, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

Initially, we note that frequently we decline to make such determinations on direct appeal. As our Supreme Court has explained, "An appellate court should not declare that a police officer acted unlawfully, suppress relevant evidence, set aside a jury verdict, and brand a defense attorney incompetent unless it can be truly confident all the relevant facts have been developed and the police and prosecution had a full opportunity to defend the admissibility of the evidence." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267 (*Mendoza Tello* ).) Thus, in *Mendoza Tello,* our Supreme Court declined to reach the merits of the defendant's claim that defense counsel was ineffective in failing to bring a motion to suppress evidence under section 1538.5, finding that because " 'the legality of the search was never challenged or litigated, facts necessary to a determination of that issue are lacking.' " (*Id.* at p. 266.)

The Attorney General does not assert that there are any undeveloped facts such that we should decline to reach the merits of Rene's claim. Accordingly, we will address the merits of this issue.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*); *In re Cox* (2003) 30 Cal.4th 974, 1019-1020.)

17

To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694.)

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 375; *People v. Wharton* (1991) 53 Cal.3d 522, 576.)

Rene's claim of ineffective assistance of trial counsel fails with respect to the search of the cellular telephone, because a warrantless search of text messages is valid as being incident to a lawful custodial arrest. (*People v. Diaz* (2011) 51 Cal.4th 84, 88, 90–101 (*Diaz*).) In *Diaz*, the California Supreme Court granted review to decide whether the Fourth Amendment to the United States Constitution permitted law enforcement officers, approximately 90 minutes after lawfully arresting a suspect and transporting him to a detention facility, to conduct a warrantless search of the text message folder of a cellular telephone they took from his person after the arrest. (*Id*. at p. 88.) The court held that under the United States Supreme Court's binding precedent, such a search is valid as being incident to a lawful custodial arrest. (*Ibid.*)

Rene points out that his trial took place in 2010 and at that time no California case authorized police to search an arrestee's cellular telephone without a warrant; and *Diaz* was pending before the California Supreme Court. He argues that authority from other jurisdictions provided strong support for a successful section 1538.5 motion.

Of course, *Diaz* was decided after the trial in this case, but the binding Supreme Court precedent on which it relied is well established.

18

As the *Diaz* court explained, "One of the specifically established exceptions to the Fourth Amendment's warrant requirement is 'a search incident to lawful arrest.' (*United States v. Robinson* (1973) 414 U.S. 218 . . . (*Robinson*).) This exception 'has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained. [Citation.]' (*United States v. Edwards* (1974) 415 U.S. 800, 802–803 . . . (*Edwards*).) As the high court has explained: 'When a custodial arrest is made, there is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed. To safeguard himself and others, and to prevent the loss of evidence, it has been held reasonable for the arresting officer to conduct a prompt, warrantless "search of the arrestee's person and the area 'within his immediate control'. . . ." [Citations.] [¶] Such searches may be conducted without a warrant, and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence. The potential dangers lurking in all custodial arrests make warrantless searches of items within the "immediate control" area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved. [Citations.]' (*United States v. Chadwick* (1977) 433 U.S. 1, 14–15 . . . (*Chadwick*).)" (*Diaz, supra*, 51 Cal.4th at p. 90.)

The *Diaz* court went on to say, "Resolution of this issue depends principally on the high court's decisions in *Robinson, Edwards,* and *Chadwick.*" (*Diaz*, *supra*, at p. 91.) The *Diaz* court went on to explain that in "*Robinson,* a police officer arrested the defendant for driving with a revoked operator's permit. (*Robinson, supra,* 414 U.S. at p. 220. . . .) The officer conducted a patdown search and felt an object he could not identify in the breast pocket of the defendant's coat. He removed the object, which turned out to be a crumpled up cigarette package. He felt the package and determined it contained objects that were not cigarettes. He then opened the package and found 14 heroin capsules. (*Id.* at pp. 222–223. . . .) The high court held that the warrantless search of the

19

package was valid under the Fourth Amendment. (*Robinson, supra,* at p. 224 . . . .) It explained that, incident to a lawful custodial arrest, police have authority to conduct 'a full search of the [arrestee's] person.' (*Id.* at p. 235 . . . .) This authority, the court continued, exists whether or not the police have reason to believe the arrestee has on his or her person either evidence or weapons. 'A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search [of the person] incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and . . . in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.' (*Ibid.*) Applying these principles, the court held: 'The search of [the defendant's] person . . . and the seizure from him of the heroin, were permissible under established Fourth Amendment law. . . . Having in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them as "fruits, instrumentalities, or contraband" probative of criminal conduct. [Citations.]' (*Id.* at p. 236 . . . fns. omitted.)" (*Diaz, supra*, at p. 91.)

The court examined *Edwards* and explained that in "*Edwards,* after lawfully arresting the defendant late one night for attempting to break into a post office, police took him to jail and placed him in a cell. (*Edwards, supra,* 415 U.S. at p. 801 . . . .) Ten hours later, suspecting that his clothes might contain paint chips from the window through which he had tried to enter, police made the defendant change into new clothes and held his old ones as evidence. (*Id.* at p. 802 . . . ; see also *id.* at p. 810 . . . (dis. opn. of Stewart, J.).) Subsequent examination of the old clothes revealed paint chips matching samples taken from the window. (*Id.* at p. 802 . . . .) The high court held that both the warrantless seizure of the clothes and the warrantless search of them for paint chips were valid as a search incident to lawful arrest. (*Id.* at pp. 802–809 . . . .) It expressly rejected

20

the argument that, because the search occurred 'after the administrative mechanics of arrest ha[d] been completed and the prisoner [was] incarcerated,' the search of the clothes was too remote in time to qualify as a search incident to arrest. (*Id.* at p. 804 . . . .) The court explained: '[O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant *even though a substantial period of time has elapsed* between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the "property room" of the jail, and at a later time searched and taken for use at the subsequent criminal trial. The result is the same where the property is not physically taken from the defendant until sometime after his incarceration.' (*Id.* at pp. 807–808 . . . fns. omitted, italics added.)" (*Diaz*, at pp. 91-92.)

Similarly, the *Diaz* court examined *Chadwick* and noted "the high court cut back on the seemingly broad rule *Edwards* had announced. In *Chadwick*, federal narcotics agents observed the defendants load a 200–pound, double-locked footlocker into the trunk of a car. Having probable cause to believe the footlocker contained illegal contraband, the agents arrested the defendants and transported them to a federal building, along with the car and the footlocker. There, 90 minutes after the arrest and without obtaining a warrant or consent, the agents opened the footlocker and found marijuana inside. (*Chadwick, supra,* at pp. 4–5 . . . .) The high court rejected the argument that the warrantless search was valid as a search incident to arrest. It first reaffirmed the principle that, because of '[t]he potential dangers lurking in all custodial arrests,' police may conduct a warrantless search incident to arrest 'whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence.' (*Id.* at p. 14 . . . .) 'However,' the court explained, 'warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either

21

if the "search is remote in time or place from the arrest," [citation], or no exigency exists. Once law enforcement officers have reduced luggage or other personal property *not immediately associated with the person of the arrestee* to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.' (*Id.* at p. 15. . . italics added.) Under this principle, the court held, because 'the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after [the defendants] were securely in custody,' it could not 'be viewed as incidental to the arrest or as justified by any other exigency.' (*Ibid.*) In reaching this conclusion, the court did not overrule *Robinson* or *Edwards,* but distinguished them as involving warrantless searches 'of the person' rather than searches 'of possessions within an arrestee's immediate control.' (*Chadwick,* at p. 16, fn. 10 . . . .) The former searches, the court explained, are 'justified by' the 'reduced expectations of privacy caused by the arrest'; the latter are not. (*Ibid.*) Thus, the defendants' 'privacy interest in the contents of the footlocker was not eliminated simply because they were under arrest.' (*Ibid.*)" (*Diaz*, at pp. 92-93.)

The *Diaz* court concluded, "Under these decisions, the key question in this case is whether defendant's cell phone was 'personal property . . . immediately associated with [his] person' (*Chadwick, supra,* 433 U.S. at p. 15 . . . .) like the cigarette package in *Robinson* and the clothes in *Edwards.* If it was, then the delayed warrantless search was a valid search incident to defendant's lawful custodial arrest. If it was not, then the search, because it was ' "remote in time [and] place from the arrest," ' 'cannot be justified as incident to that arrest' unless an 'exigency exist[ed].' (*Chadwick, supra,* at p. 15 . . . .)" (*Diaz*, at p. 93.)

Ultimately, the *Diaz* court held "the cell phone was 'immediately associated with [defendant's] person' (*Chadwick, supra,* 433 U.S. at p. 15 . . .), and that the warrantless search of the cell phone therefore was valid. As the People explain, the cell phone 'was

an item [of personal property] on [defendant's] person at the time of his arrest and during the administrative processing at the police station.' In this regard, it was like the clothing taken from the defendant in *Edwards* and the cigarette package taken from the defendant's coat pocket in *Robinson,* and it was unlike the footlocker in *Chadwick,* which was separate from the defendants' persons and was merely within the 'area' of their ' "immediate control." ' (*Chadwick, supra,* 433 U.S. at p. 15 . . . .) Because the cell phone was immediately associated with defendant's person, [the officer] was 'entitled to inspect' its contents without a warrant (*Robinson, supra,* 414 U.S. at p. 236 . . . ) at the sheriff's station 90 minutes after defendant's arrest, whether or not an exigency existed." (*Diaz*, at p. 93.)

As can be seen, the United States Supreme Court decisions on which the *Diaz* court relied were decided over 30 years ago. We reject any suggestion by Rene that there was a reasonable possibility that the trial court, not having the benefit of *Diaz*, would have ruled that the cellular telephone should not have been searched incident to his arrest. "In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." (*Strickland*, *supra*, 466 U.S. at pp. 694-695.)

Given the foregoing, we must assume that Judge Bonini would have denied the motion to suppress the cellular telephone evidence based on the aforementioned well established Supreme Court precedent. Accordingly, Rene cannot establish that he was prejudiced by his trial counsel's failure to bring a suppression motion earlier.

23

*II. Sufficiency of the Evidence to Support Rene's Convictions*

Rene argues that his convictions for shooting at an occupied vehicle (count one), assault with a firearm (counts two, three and four) and carrying a loaded firearm (count five) were not supported by substantial evidence.[18] Specifically, he argues that there was inadequate proof that he knew Domingo had a gun in the truck.

As our Supreme Court reiterated recently, " '[w]hen a defendant challenges the sufficiency of the evidence, " '[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" [Citations.] . . . "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]" [Citation.] We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" [Citation.]' [Citation.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069.)

While there were two main theories of liability under which the jury could have found Rene guilty as charged—aiding and abetting and conspiracy, the jury was presented with six different scenarios:

1. Rene aided and abetted Domingo's commission of counts one through four.

2. Rene conspired with Domingo and Herrera to commit the crimes charged in counts one through four, whether directly or as a natural and probable consequence of the crime that was the subject of the conspiracy.

3. Rene aided and abetted Domingo's commission of the uncharged crime of brandishing a firearm, with counts one through four being natural and probable consequences of that crime.

---

[18]     We have condensed two of Rene's arguments into one since they rely on the same law being applied to the same set of facts.

24

4. Rene conspired to commit the uncharged crime of brandishing a firearm, with counts one through four being the natural and probable consequences of that crime.

5. Rene conspired to commit the crime of assault with a semiautomatic firearm, with count one (shooting at an occupied vehicle) being the natural and probable consequence of that crime.

6. Rene aided and abetted the commission of the crime of assault with a semiautomatic firearm with count one being the natural and probable consequence of that crime.

As to count five, carrying a loaded firearm, it was not required that Rene actually possess the gun, but rather that he knowingly had control over it or the right to control it, either personally or through another person.[19]

If substantial evidence exists to support at least one theory, the verdict must be upheld. "If a count is submitted to a jury on alternative theories, and the evidence is insufficient as to one theory, we assume that the jury rested its verdict on the theory adequately supported by the evidence . . . . [Citation.]" (*People v. Silva* (2001) 25 Cal.4th 345, 370.)

A person may be liable for a criminal act as an aider and abettor. Section 31 defines "principals" in a crime to include persons who "aid and abet in its commission, or, . . . have advised and encouraged its commission." (§ 31.) The California Supreme Court has interpreted section 31 to require that an aider and abettor must act with "knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and . . . conduct by the aider and abettor that in fact assists the achievement of the crime. [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

---

[19]    The court instructed the jury pursuant to CALCRIM Nos. 400 [aiding and abetting general principles], 401 [aiding and abetting intended crimes], 402 [natural and probable consequences doctrine target offense brandishing a firearm and target offense assault with a semiautomatic firearm], 416 [evidence of uncharged conspiracy], 417 [liability for coconspirators' acts] and 2530 [carrying a loaded firearm].

"Once the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target, offense, but also of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target offense." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123.)

A defendant is culpable as an aider and abettor if the defendant acted with knowledge of the perpetrator's unlawful purpose and with the intent to commit, facilitate or encourage the offense. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) Aider and abettor status may not be based on mere presence at the scene or knowledge and failure to prevent the crime; however, factors such as presence, companionship, and conduct before and after the crime may be considered in making the aiding and abetting determination. (*Ibid.*) Similarly, a defendant is culpable under conspiracy principles if the defendant and another person agreed to commit a crime, intended to agree, and intended to commit the offense. (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399.) Although mere association cannot establish a conspiracy, a conspiracy may be proven by circumstantial evidence inferred from the conduct, relationship, interests and activities of the alleged conspirators before and during the alleged conspiracy. (*Id.* at pp. 1399–1400.) Where a conspiracy is concerned, " 'The general rule is well settled that where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine . . . . Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. Nevertheless the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design.' " (*People v. Kauffman* (1907) 152 Cal. 331, 334.)

Here there was compelling and substantial evidence that Rene was involved in the groups' decision to escalate aggression in the parking lot by driving away, then return to a position in the parking lot, which gave Domingo the opportunity to either brandish the weapon or actually fire into the victims' truck.

We reject Rene's argument that there was insufficient evidence that he knew Domingo was "a gangsta" who was "armed" or "was carrying a gun." Given the circumstances of this case that makes little to no sense. It was Rene, an SSP gang member,[20] who threw the gang sign after some "mad dogging" by him and Hererra at a group substantially larger than the group in the black truck. The black truck left the parking lot, but returned quickly and was positioned in such a way as to block the exit from the parking lot causing Efrem to have to pull his truck in behind and slightly to the side of the black truck. The jury could easily have inferred that the black truck returned because the occupants knew that they had superior force in the form of a semiautomatic firearm. Someone in the black truck pushed the initial confrontation to a violent conclusion; and it was Rene who set the wheels in motion by throwing the gang sign. It would have been eminently reasonable for the jury to infer that Rene, the only person who was showing aggressive conduct before the shooting, persuaded Hererra to turn the black truck around knowing that there was a gun available to either brandish or use to shoot at Efrem's truck.

Substantial evidence supports Rene's convictions.

III. *Sufficiency of the Evidence to Support the Gang Enhancements*

Domingo contends that there was insufficient evidence to permit the jury to return true findings on the gang enhancements (§ 186.22) alleged against him. He argues that

---

[20]    Although the jury was presented with copious amounts of evidence that Rene was an SSP gang member including Officer Montoya's opinion, Rene's cellular telephone and its contents alone would have provided sufficient evidence that he was a member of a gang.

27

there was no evidence that he knew Rene and Herrera were involved in the Sureño gang or that Rene flashed a hand sign as their truck left the parking lot the first time. Rene joins in Domingo's argument insofar as it implicates his convictions on the charges of shooting at an occupied vehicle and assault with a semiautomatic firearm with their related gang enhancements.

We reiterate, " '[w]hen a defendant challenges the sufficiency of the evidence, " '[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" [Citations.] . . . "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]" [Citation.] We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" [Citation.]' [Citation.]" (*People v. Lopez*, *supra*, 56 Cal.4th at p. 1069.) "The same standard of review applies to section 186.22 gang enhancements. [Citation.]" (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 610.)

As noted *ante*, a gang enhancement does not apply unless the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, *with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .*" (§ 186.22, subd. (b)(1), italics added.)

Domingo's contention is that there was insufficient evidence to support the jury's finding on the cited italicized language, i.e., that he acted "with the *specific intent* to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1), italics added.) Specifically, he claims that there was no evidence that he knew that his nephew Rene was a member of the Sureño gang, no evidence that he knew Herrera was an associate of the Sureño gang and no evidence that he knew that Rene flashed a gang sign as the truck was pulling out of the parking lot.

28

We are not persuaded by Domingo's argument. Initially, we note that given the close relationship between Domingo and Rene—as evidenced by the fact that they were uncle and nephew, and by the fact that Domingo had Rene's cellular telephone number in his cellular phone and Rene's cellular telephone contained a text message that referenced contacting Domingo at a specific address, it was reasonable for the jury to infer that Domingo knew full well that Rene was a Sureño gang member. Domingo's argument to the contrary is simply not plausible. These were not casual acquaintances; rather, they were relatives who maintained contact with each other, and, as evidenced by the fact that they were in the black truck together, both before and after the shooting, had a close social relationship.

Rarely can we know exactly what knowledge a defendant has because we cannot look into a defendant's mind. However, we can draw reasonable inferences from the context and circumstances surrounding a defendant's actions. Here, Domingo was in a truck with two other men when he fired multiple shots from a semiautomatic gun at Efrem's vehicle. The group in that vehicle was neither armed nor had they behaved aggressively toward Domingo or anyone else in the black truck. This was not robbery, a carjacking, or a road rage incident. Simply put, it was a targeted assault employing deadly weaponry. As the gang expert testified, gang encounters or perceived gang encounters often end in violence involving deadly weapons. Domingo's suggestion that the shooting was a way for Herrera, who was not even the shooter, to communicate his displeasure with a former girlfriend, who was not even present but happened to be a cousin of one of the victims, is again implausible.

Given the relationship between Domingo and Rene, and the context and circumstances of the shooting, it was reasonable for the jury to infer that Domingo knew that Rene was a gang member. As such, we reject Domingo's argument that there was insufficient evidence from which the jury could return a true finding on the gang enhancement.

29

*IV. Due Process and the Gang Expert's Testimony*

Domingo and Rene claim that the admission of Officer Montoya's expert opinions, to the extent that he relied upon police reports and information from other police officers, violated their constitutional rights because the evidence did not meet constitutional standards of reliability thereby violating their rights to due process. Domingo argues that his conviction on count one and the gang and firearm enhancements must be set aside. Rene argues that counts one through four and the gang enhancements must be reversed.

Before trial, Rene's counsel filed an in limine motion, in which he argued that Officer Montoya's testimony should be "scrutinized" in order "to determine whether [Officer] Montoya's opinions [were] inadmissible as based on unreliable or improper material."[21] During in limine proceedings, the court held an Evidence Code section 402 hearing to establish the foundation for Officer Montoya's proffered testimony. During the hearing, Domingo's counsel objected to some of Officer Montoya's testimony on the ground that it was "hearsay, multiple hearsay," and Rene's counsel objected to Officer Montoya's testimony on the ground that it was "unreliable hearsay." The trial court heard extensive pretrial testimony from Officer Montoya on both direct and cross examination. The court ruled that Officer Montoya had "substantial experience in Hispanic street gangs—particularly Sureño gangs" and "appear[ed] to have significant knowledge that would be appropriate and helpful to the finder of fact as it relates to the particular gangs involved in this case as well as Sureño criminal street gangs in general." Accordingly, the court allowed Officer Montoya to testify as an expert on "signs, symbols, culture, customs and practice of criminal street gangs" and his "opinion on all those matters subject of course to full cross-examination." The court ruled that Officer Montoya could give his opinion on whether the defendants or others were gang members, the primary activities of the gang, the gang's predicate offenses and give his opinion as to whether

---

[21] Domingo's counsel joined in all Rene's in limine motions.

certain conduct, either by way of "actual evidence" or "hypothetical based" was "for the benefit of, at the direction of, or in association of a criminal street gang."

Following the prosecution's case in chief, Domingo's counsel and Rene's counsel moved the court to strike Officer Montoya's testimony based upon the officer's reliance on field interview cards, which counsel characterized as "hearsay" that was unreliable because Officer Montoya "testified that he ha[d] no idea what the reliability of the f[ield] i[nterview] cards are . . . ." The court denied the motion. The court stated that it was a "mischaracterization of Officer Montoya's testimony to say, quote, had no idea what the reliability was."

At the time of trial, Officer Montoya had been a San Jose police officer for approximately 10 years. He worked three years as a gang detective. In that capacity, he acquired knowledge about gang members, symbols, culture, and the primary activities of gangs by speaking with the victims of gang crimes, witnesses to gang crimes, residents of gang neighborhoods, family and friends of gang members, police officers who had dealt with gang members, gang members themselves, by observing gang activities, by viewing gang tattoos, graffiti, websites, and writings, and by searching gang members' houses, cellular telephones and computers. Officer Montoya was the lead investigator in approximately 240 gang cases and assisted in the investigation of others. Most of these investigations involved Hispanic gangs. In addition, Officer Montoya received formal instruction and on-going updates on gang matters and trends; and he trained other law enforcement officers in San Jose and elsewhere on gang topics. The officer had qualified as an expert on gangs in court on at least eight previous occasions.

Officer Montoya investigated cases involving Sureño gang members both before and after the investigation in this case. He had had personal contact with SSP gang members. Officer Montoya described his opinions as based upon instruction from other officers who trained him as a gang investigator, speaking to gang members and victims, and "the culmination of . . . ten years working the street -- working the gang areas, talking

31

to other officers . . . reading reports or conducting parole or probation searches, so it is a combination of all that experience."  Later, Officer Montoya reiterated that he based his opinions on information gathered from reading crime reports, field interview cards, speaking with other investigators, assisting other detectives in their investigations and conducting his own investigations.

The crux of Domingo's and Rene's due process argument is that the information upon which Officer Montoya based his opinions and testimony was unreliable hearsay.

" 'Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (*Id.,* subd. (a).)  The subject matter of the culture and habits of criminal street gangs . . . meets this criterion.'  [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).)  In addition, "[d]espite the circumstance that it is the jury's duty to determine whether the prosecution has carried its burden of proof beyond a reasonable doubt, opinion testimony may encompass 'ultimate issues' within a case.  Evidence Code section 805 provides that '[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' "  (*People v. Prince* (2007) 40 Cal.4th 1179, 1227 (*Prince*).)  "Because an expert's need to consider extrajudicial matters and a jury's need for information sufficient to evaluate an expert opinion may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment."  (*People v. Valdez* (1997) 58 Cal.App.4th 494, 510 (*Valdez*).)

We conclude the trial court properly allowed Officer Montoya to testify that his opinions were based, in part, on information derived from his personal conversations with rival gang members and police reports and field interview cards that were prepared by

other officers.  (Evid. Code, § 801, subd. (b);[22] *People v. Gonzalez* (2006) 38 Cal.4th 932, 949 (*Gonzalez* ) [gang expert allowed to testify that his opinion was not based on information from a single person but on corroborative information from other citizen informants, other evidence that we have at hand, reports, and people from the community]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1124 (*Hill*) [gang expert's opinion may be based on hearsay statements of gang members]; *Valdez, supra,* 58 Cal.App.4th at p. 507 [gang expert allowed to testify that defendant was member of particular gang and his activities were undertaken on behalf of the gang].)  "A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable.  [Citation.]"  (*Gonzalez, supra,* 38 Cal.4th at p. 949.)  At no time did Officer Montoya testify that he based his opinions solely on the information that Domingo and Rene now challenge on appeal.  "Challenging the reliability [of the information is], and in fact [was] here, [a matter] for cross-examination."  (*Valdez, supra,* 58 Cal.App.4th at p. 507, fn. 11.)

Domingo's and Rene's foundational attack on Officer Montoya's testimony is similar to that rejected by our Supreme Court in *Gardeley, supra,* 14 Cal.4th 605 and *Gonzalez*, *supra*, 38 Cal.4th 932.  In *Gardeley,* the gang expert based his opinion on interviews with the defendant and other members of the defendant's gang, and on "his

---

[22]     Evidence Code section 801 reads, in pertinent part: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:  [¶]  . . . Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."  (*Id.,* subd. (b).)  "[N]o statute prohibits an expert from expressing an opinion regarding whether a crime was gang related.  Indeed, it is settled that an expert may express such an opinion.  To the extent the expert may not express an opinion regarding the actual defendants[] that is because the jury can determine what the defendants did as well as an expert, not because of a prohibition against the expert opining on the entire subject."  (*Vang, supra,* 52 Cal.4th at p. 1052.)

personal investigations of hundreds of crimes committed by gang members," including discussions with investigators from his own police department and other law enforcement agencies. (*Gardeley, supra,* 14 Cal.4th at p. 620.) The Supreme Court concluded this provided an adequate basis for the expert's opinion that the primary activities of the defendant's gang included the prohibited offenses listed in section 186.22, subdivision (e). (*Ibid.*) In *Gonzalez,* the prosecution's gang expert conceded his opinion rested in part on potentially inaccurate hearsay statements he had " 'received in the street.' " (*Gonzalez, supra,* 38 Cal.4th at p. 947.) The court rejected a claim the expert based his opinion on unreliable hearsay, explaining, "A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable." (*Id.* at p. 949.)

The foundation for the expert's opinion in *Gardeley* is substantially similar to the basis Officer Montoya provided for his opinion. Furthermore, Officer Montoya, similar to the expert in *Gonzalez,* properly based his opinion on his overall experience investigating criminal gangs, including SSP and other Sureño subsets.

In sum, in light of *Gardeley* and *Gonzalez*, we reject Domingo's and Rene's due process challenge to Officer Montoya's testimony.

*V. Confrontation Clause Challenge to Proof that Appellants Illegally Possessed a Firearm*

Both Domingo and Rene contend that their Sixth Amendment confrontation rights were violated when the prosecution introduced into evidence a California Department of Justice certification of firearm ownership as proof that neither of them was the registered owner of the gun used in the shooting.

As relevant to this issue, when appellants were charged, section 12031 provided, "(a)(1) A person is guilty of carrying a loaded firearm when he or she carries a loaded firearm on his or her person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited

34

area of unincorporated territory. [¶] (2) Carrying a loaded firearm in violation of this section is punishable, as follows: . . . [¶] (F) Where the person is not listed with the Department of Justice pursuant to Section 11106, as the registered owner of the handgun, by imprisonment in the state prison, or by imprisonment in a county jail not to exceed one year, or by a fine not to exceed one thousand dollars ($1,000), or both that fine and imprisonment." (Stats. 2009, ch. 288, § 1.)

*Background*

On September 28, 2010, after Edward Peterson testified regarding the gun used in this case, the prosecutor moved to have marked for identification Exhibit 67, a "Certified Certification of Firearm History." Rene's trial counsel objected as to "the relevance of [the] document." After a brief bench conference, Rene's trial counsel asked for "the opportunity to do some research" before the court admitted the document into evidence. The court asked counsel if he was making an "authentication objection" to which counsel replied, "No. Appears to be a duly-certified document, but certified document means it is admissible. It means that it is duly certified. It has to be relevant, and I don't know at this juncture. I need to talk to somebody before I am prepared to do that to admit it into evidence. [¶] I have no objection to it being marked and it is certified. . . . [¶] I'm not contesting certified. If it is relevant, then it is admissible, and I will only argue if it is not relevant and I get certain information." The court marked Exhibit 67 for identification. Domingo's trial counsel made no objection to Exhibit 67. Exhibit 67 was admitted into evidence on October 1, 2010, without objection from either trial counsel, other than "the representation" that Rene's trial counsel "made previously."

Subsequently, on July 15, 2011, almost eight months after the verdicts were announced, on the record, the Court made the following statement: "We discussed the matter briefly off the record, and the court does have a concern about the charge in 12031

35

which I believe is count six,[23] and so we are going to continue sentencing at least for the determination of that particular issue.  [¶]  The issue there is whether the evidence that was presented at trial was insufficient based on the confrontation grounds, and I want counsel to have an opportunity to read the case that the Sixth District recently came out with and then make an argument to the Court about how to go forward . . . ."

No formal briefing of this issue appears in the record.  At the sentencing hearing, in sentencing Domingo, the court stated, "Count 5 which the Court finds is applicable, the Court finds no confrontation violation in the submission of evidence of the certification of firearm history, and the Court finds our case to be distinguishable from the case of People vs . Sanchez which is 193 Cal.App.4th 928."[24]

Domingo recognizes that there was no defense objection to Exhibit 67 on the ground that its admission violated his confrontation rights.  He argues, however, that such an objection may be implied.[25]  Although Domingo frames the issue as one of insufficient evidence to support the verdict and urges this court to reverse his conviction on count five, he now argues that Exhibit 67 was admitted in violation of his confrontation rights as established in *Crawford v. Washington* (2004) 541 U.S. 36 and *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.

Rene does not even address the forfeiture issue, but argues that the court's decision to admit the evidence was essentially erroneous.  He asks that we reverse his conviction on count five.

---

[23]     In fact the section 12031 charge was count five.

[24]     The Supreme Court granted review in *People v. Sanchez* on July 20, 2011.  The Supreme Court ordered briefing deferred pending its decision in *People v. Brown,* S181963, (which has since been published at 54 Cal.4th 314) on the issue of the retroactivity of the January 2010 version of section 4019.  On March 20, 2013, the Supreme Court transferred *People v. Sanchez* back to this court and dismissed review. (<http://appellatecases.courtinfo.ca.gov> S193084.)

[25]     We will not imply that an objection on the specific ground that is being argued on appeal was made when nothing appears in the record to support such an assertion.  We have no idea regarding the content of the "discussions" that were had off the record.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶] (a)  There appears of record an objection to . . . the evidence that *was timely made* and so stated as to make *clear the specific ground of the objection or motion. . . .*"  (Evid. Code, § 353, italics added.)

Domingo and Rene have forfeited their contentions of federal constitutional error by failing to assert them before the trial court.  (*People v. Redd* (2010) 48 Cal.4th 691, 730; *People v. Gutierrez* (2009) 45 Cal.4th 789, 809 [confrontation clause claim forfeited by failing to raise it below].)  Below, only Rene's trial counsel expressed his objection to Exhibit 67 but purely on the state law ground of its relevance; no mention of any confrontation clause or due process violation was made by either counsel for Domingo or Rene.  Accordingly, this issue is forfeited.

Even if we were to look at this issue as a challenge to the sufficiency of the evidence to support count five, "[i]t is settled law that incompetent testimony, such as hearsay or conclusion, if received without objection takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding.  [Citations.]  'Evidence technically incompetent admitted without objection must be given as much weight in the reviewing court in reviewing the sufficiency of the evidence as if it were competent.  [Citations.]' "  (*Berry v. Chrome Crankshaft Co.* (1958) 159 Cal.App.2d 549, 552-553; accord *People v. Bailey* (1991) 1 Cal.App.4th 459, 463.)

Exhibit 67 was competent evidence that neither Domingo nor Rene was the registered owner of the firearm used in the shooting for purposes of the section 12031 charge of carrying a loaded firearm in a vehicle by a person not the registered owner.

*VI. Confrontation Clause Challenge to the Gang Expert's Testimony*

Domingo and Rene argue that Officer Montoya's expert testimony violated their Sixth Amendment confrontation rights by his recitation of allegedly testimonial statements to the jury.  Domingo provides the substantive argument, which Rene joins.

37

Specifically, Domingo contends that Officer Montoya impermissibly relayed to the jury "testimonial statements contained in law enforcement[] field identification cards, police reports, and out-of-court statements relayed by other law enforcement officers ('gang contacts') . . . . "  Domingo asserts that the detailed hearsay was offered as the bases for Officer Montoya's opinions on elements essential to prove motive and the elements of the gang enhancements.  He argues these statements were testimonial and effectively offered for the truth; and, therefore, opened up a backdoor exception to the Confrontation clause in violation of the Sixth Amendment.[26]  We are not persuaded by Domingo's arguments.

The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)

As noted, an expert may offer an opinion if the subject is sufficiently beyond common experience and the opinion would assist the trier of fact.  (Evid. Code, § 801, subd. (a).)  In general, the testimony of a gang expert meets this test.  (*Valdez*, *supra*, 58 Cal.App.4th at p. 506.)  Beyond the foregoing, expert opinion must be "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates[.]"  (Evid. Code, § 801, subd. (b).)  Under the Evidence Code, an expert may rely on hearsay such as conversations with gang members and information gained from law enforcement colleagues and agencies.  (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209–1210 (*Thomas*).)  Nevertheless, currently, the ability of an expert to rely on hearsay without implicating the confrontation clause concerns is in a state of flux.

_____

[26]     Nowhere does Domingo identify specific evidence from specific people who he would have wanted to cross examine.

As is relevant here, there are two broad categories of hearsay evidence: testimonial and nontestimonial. The United States Supreme Court has explained the distinction in the context of police questioning. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822; *Michigan v. Bryant* (2011) 562 U.S. ___ [131 S.Ct. 1143, 1155] (*Bryant*) [the most important instances in which the confrontation clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial].)

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the court held that when nontestimonial hearsay is at issue, the confrontation clause does not bar it. Similarly, the confrontation clause does not "bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]" (*Id*. at pp. 59–60, fn. 9.) However, testimonial hearsay to prove the truth of the matter asserted is not permissible unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant. (*Id*. at pp. 59–60, fn. 9, p. 68; *Thomas, supra,* 130 Cal.App.4th at p. 1208.) As the *Thomas* court stated, "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Thomas, supra,* 130 Cal.App.4th at p. 1210; *People v. Sisneros* (2009)

174 Cal.App.4th 142, 153–154, (*Sisneros*) [citing *Thomas* with approval]; *Hill*, *supra*, 191 Cal.App.4th at pp. 1127–1128 [the court reluctantly followed *Thomas* on the theory that *Thomas* found its roots in the binding precedent of *Gardeley*].)

In *Gardeley, supra*, 14 Cal.4th 605, the California Supreme Court explained that expert testimony may be "premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions" and "even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony"; and "because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Id.* at p. 618.) *Gardeley* concluded that a gang expert, in opining that an assault in which the defendant participated was gang related, properly relied on and revealed an otherwise inadmissible hearsay statement by one of the defendant's alleged cohorts that he, the alleged cohort, was a gang member. (*Id.* at pp. 611–613, 618–619.) In reaching this conclusion, *Gardeley* reasoned it was proper for the expert to reveal the alleged cohort's hearsay statement, because the hearsay evidence or statement *was not offered for its truth* and was properly allowed under Evidence Code section 802. (*Id.* at pp. 618-619.)

Nevertheless, subsequent developments in the law require us to examine the continuing precedential value of the *Thomas* line of cases and *Gardeley* as it relates to this confrontation clause issue.

In *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*), "the prosecution called an expert who testified that a DNA profile produced by an outside laboratory . . . matched a profile produced by the state police lab using a sample of the [defendant's] blood." (*Id*. at p. 2227.) In the plurality opinion, Justice Alito stated that "[o]ut-of-court statements that are related by the expert solely for the purpose of

40

explaining the assumptions on which [an] opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Id*. at p. 2228.) Alternatively, Justice Alito wrote that confrontation clause concerns were not implicated because the profile was "very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions[] that the Confrontation Clause was originally understood to reach." (*Ibid.*) Moreover, the profile was obtained before any suspect was identified and it was "sought not for the purpose of obtaining evidence to be used against [the defendant], who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose." (*Ibid.*) According to Justice Alito, the profile was not "inherently inculpatory." (*Ibid*.) Also, the use of DNA evidence to exonerate people who have been wrongfully accused or convicted is well known. "If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. [Citation.] The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial." (*Ibid*.)

Justice Thomas concluded that the confrontation clause was not violated, but for very different reasons; he offered a separate, concurring analysis. He concluded that the disclosure of the outside laboratory's out-of-court statements by means of the expert's testimony did not violate the confrontation clause because it "lacked the requisite 'formality and solemnity' to be considered 'testimonial' " for purposes of the confrontation clause. (*Williams, supra,* 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.).) Justice Thomas opined that "there was no plausible reason for the introduction of [the] statements other than to establish their truth." (*Id*. at p. 2256.) The remaining four

41

justices joined in a dissent authored by Justice Kagan; they rejected the idea that the expert's testimony was not offered for its truth. (*Id.* at pp. 2265, 2268 (dis. opn. of Kagan, J.).) Due to Justice Thomas's concurring opinion, Justice Kagen asserted that "[f]ive justices specifically reject every aspect of [the plurality's] reasoning and every paragraph of its explication." (*Id.* at p. 2265 (dis. opn. of Kagan, J.).)

After *Williams,* the California Supreme Court analyzed confrontation clause issues in *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*), *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*). All three cases involved witnesses who testified about technical reports that they did not prepare. (*Lopez, supra,* 55 Cal.4th at p. 573 [a laboratory analyst testified regarding a blood-alcohol level report prepared by a colleague]; *Dungo, supra,* 55 Cal.4th at p. 612 [a pathologist testified regarding the condition of the victim's body as recorded in an autopsy report prepared by another pathologist]; *Rutterschmidt, supra,* 55 Cal.4th at p. 659 [a laboratory director testified that his analysts had detected the presence of alcohol and sedatives in the victim's blood].) In *Lopez,* the court found no confrontation clause violation because the critical portions of the report regarding the defendant's blood-alcohol level were not made with "the requisite degree of formality or solemnity to be considered testimonial." (*Lopez, supra,* 55 Cal.4th at p. 582.) The *Dungo* court declined to find a confrontation clause violation because the "criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the victim's] body; it was only one of several purposes. . . . The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial." (*Dungo, supra,* 55 Cal.4th at p. 621.) The confrontation clause issue in *Rutterschmidt* was not reached because the court concluded that the evidence of guilt was overwhelming and any error was harmless beyond a reasonable doubt. (*Rutterschmidt, supra,* 55 Cal.4th at p. 661.)

In *Lopez*, our Supreme Court looked at the fractured *Williams* opinion and explained that "all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Lopez, supra,* 55 Cal.4th at p. 582.) However, this rule sheds very little light on whether a gang expert can provide an opinion that is based on hundreds of different pieces of information, especially given the reality that gang experts often rely on a mixture of knowledge gained through personal observations and investigations, nontestimonial hearsay and testimonial hearsay. In other words, a gang expert's opinion is likely based at least in part on matter that raises no confrontation clause concerns. Moreover, practically speaking there is a distinction between a scientific or medical expert relying on a report versus a gang expert relying on multiple sources. With respect to a report involving DNA, blood-alcohol levels or an autopsy, the prosecution could simply call the person who prepared the report to testify. On the other hand, in a gang case, it is safe to assume that it would be totally impractical for the prosecution to call all the sources of testimonial hearsay to the stand to lay the foundation for the expert's opinion. Moreover, if a defense attorney must inquire into every piece of information relied upon by a gang expert, and if a trial court must then determine whether the expert's opinion is adequately supported by personal knowledge and nontestimonial hearsay, every gang allegation would result in a time-consuming trial within a trial. Furthermore, undoubtedly from a defendant's perspective such confrontation would be futile and counterproductive; we can envision a situation where a parade of tattoo-sporting gang members are called to the stand to testify (or plead the 5th) that they are in fact members of a defendant's gang and have committed various felony offenses. For these reasons, it is not clear whether ultimately our Supreme Court will disapprove of the *Thomas* line of cases and/or reevaluate its *Gardeley* decision.

Although the California Supreme Court decision concluding this type of evidence is not admitted for its truth was reached before the United States Supreme Court

43

reconsidered the confrontation clause in *Crawford, supra,* 541 U.S. 36, since the time of that reconsideration, as can be seen in *Williams,* such a conclusion has been called into doubt. While the California Supreme Court considered the hearsay implications of such evidence in *Gardeley*, the court did not specifically consider the argument raised by Domingo here: admitting the out-of-court statements to *evaluate* the opinion effectively admitted them for their *truth.* That being said, we as an intermediate appellate court are required to follow *Gardeley*; and, other courts have concluded based on *Gardeley* that the evidence on which an expert relies is properly admitted since it is offered to evaluate the expert's opinion and not for its truth. (*Thomas, supra,* 130 Cal.App.4th at p. 1210; *Sisneros, supra,* 174 Cal.App.4th at pp. 153–154; *Hill*, *supra*, 191 Cal.App.4th at p. 1131.)

In short, we must follow *Gardeley* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) and therefore reject Domingo's and Rene's confrontation clause challenge to Officer Montoya's expert testimony.

Finally, Domingo challenges the admission of the court documents received as evidence of predicate gang offenses. However, the certified minute orders and other court documents were nontestimonial in nature. As a result, they do not give rise to confrontation clause concerns under the current state of the law. A certified minute order is an "official record of conviction" under Evidence Code section 452.5 and has been held admissible to prove a predicate offense within the meaning of section 186.22. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1460; Evid. Code, § 452.5, subd. (b).) The United States Supreme Court has clarified the relationship between the business-and-official-records hearsay exceptions and the confrontation clause. "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial— they are not testimonial." (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 324.)

44

When the minute orders and other court documents were created they were not prepared for the purpose of establishing or proving some fact at a later trial.

*VII. Sufficiency of the Evidence that the Sureños are a Criminal Street Gang[27]*

Domingo contends that there was insufficient evidence that the Sureños, including the subset SSP, are a "criminal street gang" that engage in a "pattern of criminal gang activity" as a primary activity for purposes of section 186.22, subdivisions (b), (e) and (f). Rene joins in this issue, but presents no substantive argument.

Domingo aserts that 1) Officer Montoya's opinion that the Sureños and the subset SSP are criminal street gangs under the STEP Act "was an impermissible expert opinion on a question of law" and 2) evidence that the predicate crimes were committed by Sureños was based on "inadmissible hearsay." As such, he argues that the jury's findings on the gang enhancement were not supported by substantial evidence.

Relevant to this issue, section 186.22, subdivision (f), defines a criminal street gang as an "ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more" criminal acts enumerated in subdivision (e) of the statute, and which has a "common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." As noted, Officer Montoya opined that the Sureños, including their SSP subset, are a criminal street gang under this definition.

Certainly, "[t]here are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law." (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178.)

---

[27] Again, we have condensed two of Domingo's arguments (III and IV) into one as they rely on challenges to Officer Montoya's testimony.

45

Nevertheless, even if we were to exclude Officer Montoya's opinion as to whether the Sureños, including their SSP subset, qualified as a criminal street gang, there was sufficient evidence to support that finding; and that the gang engages in a qualifying pattern of criminal gang activity as one of their activities.[28] Officer Montoya testified about specifics of the Sureños that satisfied the criteria for the jury to find that the Sureños satisfy the statutory definition. Specifically, he testified as to the number of Sureño gang members in San Jose, the gang's unifying name, color, and symbols and criminal activities and the pattern of criminal Sureño behavior as illustrated by the prior conviction evidence of several Sureño gang members. This was sufficient evidence from which the jury could conclude that the Sureños fit the statutory definition of a criminal street gang.

To the extent that Domingo's argument that the evidence that the predicate crimes were committed by Sureños was based on "inadmissible hearsay" is yet another attack on the propriety of Officer Montoya's sources for the information on which he based his opinions, it fails for the same reasons as set forth in argument IV *ante*.

Officer Montoya's testimony about the prior crimes was based on the same type of information that we have approved many times in the past; these include police reports, field interview cards, tattoos, suspects' admissions, and other records. They represent the kinds of information that a gang expert must rely on. Officer Montoya's testimony and conclusions that the prior crimes were committed by Sureño gang members along with the certified copies of the records of conviction for Pedrisco, Arellano, et al, was evidence sufficient for the jury to conclude that the Sureños engaged in a "pattern of criminal gang activity" as a primary activity for purposes of section 186.22, subdivisions (b), (e) and (f) We reiterate that "[t]he testimony of a gang expert, founded on his or her

---

[28] We note in passing that the California Supreme Court has acknowledged that the Sureños are a large criminal street gang, with numerous subgroups. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1121.)

46

conversations with gang members, personal investigation of crimes committed by gang members, and information obtained by colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities." (*People v. Duran*, *supra*, 97 Cal.App.4th at p. 1465; accord *Gardeley*, *supra*, 14 Cal.4th at p. 620.)

Accordingly, we must reject Domingo's and by extension Rene's challenge to the sufficiency of the evidence that the Sureños are a criminal street gang that engage in a pattern of criminal gang activity.

*VIII. The Trial Court's Sentencing Discretion*

*Background*

Before sentencing, at the behest of Judge Bonini, the prosecution filed points and authorities with the trial court discussing the scope of the court's authority in sentencing on count one—the felony violation of section 246 (shooting at an occupied vehicle) for the benefit of a criminal street gang, in particular, the court's ability to strike the gang allegation. The prosecution pointed out that the punishment was a mandatory 15 years to life in prison. Rene and Domingo each filed a sentencing memorandum urging the court to exercise its discretion to reject the recommendations set forth in the presentence probation report and impose a more lenient sentence. Judge Bonini indicated that he had read the briefing by both sides. He entertained lengthy argument from both defense attorneys and the prosecutor.

Before imposing sentence, Judge Bonini stated that if he had a "free choice on what sentence to give the defendants" he would "choose a lesser sentence." However, he went on to say, "I intend to follow the Legislature's statutory framework for punishment, so if it was my personal choice, I would give less. It is not my personal choice. I intend to follow the law." Thereafter, as noted, Judge Bonini sentenced Rene to 15 years to life in prison on count one. Similarly, he sentenced Domingo to 15 years to life on count one

47

plus 20 years for the personal use of a firearm enhancement for a total of 35 years to life.[29]

Rene and Domingo contend that this matter must be remanded to the sentencing court because Judge Bonini did not understand that he had discretion to choose a more lenient term of imprisonment. Specifically, they argue that Judge Bonini did not consider that he could have reduced count one (shooting at an occupied vehicle) to a misdemeanor thereby precluding imposition of the alternate penalty specified in section 186.22, subdivision (b)(4)(B), which would have made available a range of other sentencing options. In the alternative, both Rene and Domingo argue that their respective attorneys were constitutionally ineffective in failing to suggest an alternative sentence.

Certainly, a violation of section 246—shooting at an occupied vehicle—is a wobbler, punishable with either a county jail term between six months and one year if it is a misdemeanor, or three, five, or seven years in state prison if it is a felony. (§ 246.) The section 246 counts in this case were charged as felonies and resulted in felony jury verdicts. A true finding that a felony was gang related within the meaning of section 186.22, subdivision (b), carries with it an alternative felony sentence of 15 years to life. (*People v. Jefferson* (1999) 21 Cal.4th 86, 101 [subdivision (b)(4) of section 186.22 sets forth an alternate penalty for the underlying felony when the jury has determined that the defendant has satisfied the conditions specified in the statute].) Specifically, section 186.22, subdivision (b)(4) provides, "Any person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall upon conviction of that felony be sentenced to an indeterminate term of life imprisonment with a minimum term of the

---

[29]     After sentencing Domingo, Judge Bonini noted that he did not find the sentence "to be a cruel and unusual sentence although not the sentence the Court would otherwise impose."

indeterminate sentence calculated as the greater of: . . . [¶] (B) Imprisonment in the state prison for 15 years, if the felony is . . . a felony violation of Section 246 . . . ." Thus, subdivision (b)(4) eliminates a trial court's discretion to punish a felony violation of section 246 under normal sentencing parameters. (*People v. Brookfield* (2009) 47 Cal.4th 583, 591-595.)

At the outset, respondent argues that Domingo and Rene have forfeited this claim on appeal because trial counsel did not advocate reducing the section 246 convictions to misdemeanors. However, since Domingo and Rene have raised claims of ineffective assistance of counsel in this matter we will address the issue on the merits.

Assuming, for the sake of argument that the trial court had statutory discretion to impose either a felony sentence or a misdemeanor sentence for the crime of shooting at an occupied vehicle with a gang enhancement, we conclude that the record shows no error.

We start from the premise that a trial court is presumed to understand the scope of its sentencing discretion. (*People v. Jeffers* (1987) 43 Cal.3d 984, 1000; *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913.) While Domingo and Rene point to the trial court's articulated preference to impose a more lenient sentence, we are not convinced that Judge Bonini's statements expressed a mistaken belief about the scope of the court's sentencing discretion. We do not interpret Judge Bonini's comments during sentencing as an indication that he believed he had no discretion to reduce the section 246 charge to a misdemeanor or that he would have so done if he could have so done. Read in context, Judge Bonini's comments referred to the fact that the mandatory 15 years to life sentence under section 186.22, subdivision (b)(4)(B) left him no discretion to craft a lesser *prison term*. There is simply no indication that Judge Bonini would have preferred to have imposed a one year county jail term.

Furthermore, "in light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot

49

presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion.  [Citations.]"  (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.)

*People v. Meloney* (2003) 30 Cal.4th 1145, *People v. Belmontes* (1983) 34 Cal.3d 335, 342, 347, *People v. Gamble* (2008) 164 Cal.App.4th 891, *People v. Bruce G*. (2002) 97 Cal.App.4th 1233, *People v. Fritz* (1985) 40 Cal.3d 227 and *People v. Deloza* (1998) 18 Cal.4th 586, cited by either Rene and/or Domingo are all distinguishable as they involved trial courts that affirmatively misstated the scope of discretion they possessed or misunderstood statutory criteria that were the stated bases for the sentences imposed in the respective cases.  (*People v. Meloney, supra,* 30 Cal.4th at p. 1165 [trial court incorrectly stated that it had no discretion to strike an on bail enhancement when, in fact, it did]; *People v. Belmontes*, *supra*, 34 Cal.3d at pp. 342, 347 [remand appropriate because trial court sentenced defendant as a sex offender pursuant to section 667.6, subdivision (c), without stating reasons for that choice.]; *People v. Gamble*, *supra*, 164 Cal.App.4th a p. 901 [trial court misinterpreted statute and believed, incorrectly, that a consecutive term was statutorily mandated; *People v. Bruce G*., *supra*, 97 Cal.App.4th at p. 1247 [trial court misapplied statutory probation eligibility criteria]; *People v. Fritz*, *supra*, 40 Cal.3d at p. 229 [trial court erroneously stated that it had no discretion to strike a prior under section 1385]; and *People v. Deloza*, *supra*, 18 Cal.4th at p. 600 [trial court affirmatively misunderstood scope of sentencing discretion to impose concurrent sentences under the three strikes law].)  None of these cases involved a case such as this where the trial judge correctly followed a statutory sentencing structure.

One case cited by Domingo illustrates the difference between the cases cited by Domingo and Rene and the present case.  In *People v. Gillispie* (1997) 60 Cal.App.4th 429, the court stated "if error affirmatively appears on the record, the defendant may seek remand for resentencing through an appeal.  We stress, however, the requirement that error must affirmatively appear on the record."  (*Id*. at p. 434.)  No such affirmative error

50

appears here.  In short, we will not conclude the trial court misunderstood the scope of its sentencing discretion "in the absence of some affirmative showing that it misunderstood its discretion."  (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 695.)

Furthermore, neither Domingo nor Rene can show that counsel was ineffective in failing to suggest to Judge Bonini that he could reduce count one to a misdemeanor. Neither can demonstrate ineffective assistance of counsel because neither is able to establish it is reasonably probable that they would have received a county jail sentence if trial counsel had asked Judge Bonini to reduce count one to a misdemeanor.  "In considering a claim of ineffective assistance of counsel, it is not necessary to determine ' "whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." '  [Citations.]  It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different.  [Citations.]"  (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

From the record, it is quite apparent that Judge Bonini sought a way to be able to strike the gang enhancement but still fashion a prison sentence.  Even though nobody was injured in this case, it is highly improbable that any trial court would view as misdemeanor conduct a drive-by gang shooting involving a semiautomatic handgun fired repeatedly at a truck filled with people.

*IX. The One-Year Firearm Enhancement*

Rene claims that we must strike the one year firearm enhancements (§ 12022, subd. (a)(1)), which the court imposed on his three convictions for assault with a semiautomatic firearm (§ 245, subd. (a)(2), counts two, three and four), because the

51

enhancement cannot apply when the underlying offense has as one of its elements being armed with a firearm.[30] Respondent concedes the issue. That concession is appropriate.

Section 12022 provides in relevant part "(a)(1) Except as provided in subdivisions (c) and (d), any person who is *armed* with a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment pursuant to subdivision (h) of Section 1170 for one year, *unless the arming is an element of that offense.* This additional term shall apply to any person who is a principal in the commission of a felony or attempted felony if one or more of the principals is armed with a firearm, whether or not the person is personally armed with a firearm." (Italics added.)

In turn section 245, subdivision (b) provides, "Any person who commits an assault upon the person of another *with a semiautomatic firearm* shall be punished by imprisonment in the state prison for three, six, or nine years." (Italics added.)

Rene was charged with and found guilty of three counts of assault with a semiautomatic firearm. Being armed with a firearm is an element of the offense. (CALCRIM No. 875 [the defendant did an act *with a semiautomatic firearm* that by its nature would directly and probably result in the application of force to a person], italics added; see *People v. Sinclair* (2008) 166 Cal.App.4th 848, 855-856 [error to impose one year arming enhancement when the defendant was convicted of assault with a firearm under section 245, subdivision (a)(2)].)[31]

Rene asks that we strike the enhancement as unauthorized. The Attorney General agrees that this is the appropriate remedy. Accordingly, we will strike the one year arming enhancement imposed by the court on counts two, three and four.

---

[30] Although the court imposed the 12022 enhancement on counts two, three and four, the court stayed the enhancement terms.

[31] In language almost identical to subdivision (b) of section 245, section 245, subdivision (a)(2) provides, "Any person who commits an assault upon the person of another with a firearm shall be punished by imprisonment in the state prison . . . ."

*X. The Abstract of Judgment*

Domingo contends that the abstract of judgment incorrectly reflects the sentence the court imposed. Domingo points out that the trial court imposed a six year prison term on count three, plus terms for the gang enhancement and personal use of a firearm (a total of 20 years), to run concurrent with the 15 years to life imposed for count one. The abstract of judgment reflects that the enhancements are to run concurrent, but does not show the prison term for the substantive offense (assault with a semi-automatic firearm) is to run concurrent. Furthermore, Domingo notes that the abstract of judgment reflects that he was convicted by plea. Domingo is correct.

Without doubt this was clerical error. Both the reporter's transcript and the sentencing minutes indicate that the total term on count three was to run concurrent with the term on count one. Further, as can be seen from the foregoing, Domingo was convicted by a jury. Accordingly, we will order that the abstract of judgment be corrected. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [courts may correct clerical errors at any time, and appellate courts that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts].)

*XI Cumulative Error*

Rene asserts that the cumulative effect of all the errors in this case violated his due process rights. He argues that proof that the offense was gang related hinged on proving that he was a gang member; but that proof was produced through two improperly produced types of evidence—the images and graphics on the cellular telephone that counsel failed to seek to exclude and the multiple layers of unreliable hearsay that he associated with Sureño and SSP members. He argues that without this evidence the only evidence that he was a gang member was that he wiggled his fingers out of the truck window and he had SSP marked on the cover of his cellular telephone. He asserts that when you take away all the unreliable hearsay, the *Crawford* errors, and counsel's failure

53

to exclude critical evidence, the prosecution's case crumbles. Accordingly, he contends that the cumulative effect of the errors unfairly sent two young men to prison for life.

"The concept of finding prejudice in cumulative effect, of course, is not new. Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial. [Citations.]" (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)

Under some circumstances, several errors that are each harmless on their own should be viewed as prejudicial when considered together. (*People v. Hill* (1998) 17 Cal.4th 800, 844, overruled on a different ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Since we have found none of appellant's claims of error meritorious, a cumulative error argument cannot be sustained. No serious errors occurred, which whether viewed individually or in combination, could possibly have affected the jury's verdict. (*People v. Martinez* (2003) 31 Cal.4th 673, 704; *People v. Valdez* (2004) 32 Cal.4th 73, 128.) To put it another way, since we have found no substantial error in any respect, appellant's claim of cumulative prejudicial error must be rejected. (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

*Disposition*

As to Domingo Rojas, the abstract of judgment is ordered modified to reflect that he was convicted following a jury trial and the sentence on count three is to run concurrent to the sentence on count one. With those corrections the judgment is affirmed. As to Rene Rojas, the judgment is modified to delete the one-year firearm enhancements on counts two, three and four, as so modified the judgment is affirmed. The clerk of the court is ordered to forward copies of the modified abstracts of judgment to the Department of Corrections and Rehabilitation.

_____

ELIA, J.


I CONCUR:



_____

PREMO, J.

RUSHING, P.J., Dissenting and Concurring

I dissent from the majority's treatment of the testimonial hearsay introduced through the police "gang expert." I believe the trial court violated defendants' rights to confront the witnesses against them when it permitted a police "gang expert" to serve as a conduit for incriminating extrajudicial statements gathered by police officers while investigating criminal street gangs and their activities. The majority declares itself bound to reject this proposition under the authority of *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*). (Maj. opn. at p. 44.) But that case did not decide, address, or even acknowledge any issue arising under the confrontation clause of the United States Constitution. Nor has any other decision by either the California Supreme Court or the United States Supreme Court decided the question presented here, which is the applicability of the confrontation clause to extrajudicial statements gathered by police in connection with gang investigations and offered ostensibly to explain the "basis" for an opinion by a so-called "gang expert."

Most of the published California decisions recognize that *Gardeley* is not binding authority on this question. (See *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209 [citing *Gardeley* with a "see" signal]; *People v. Cooper* (2007) 148 Cal.App.4th 731, 747 ["see also"]; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153 ["see"]; *People v. Steppe* (2013) 213 Cal.App.4th 1116, 1127 [holding that admission of challenged evidence did not offend confrontation clause and, citing *Gardeley*, "was proper under California authority as well"].) The one case to conclude otherwise is *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127 (*Hill*), where the court—after agreeing with me that testimonial hearsay admitted as the basis for expert opinion in fact offends the confrontation clause—declared itself powerless to follow that view to its logical conclusion because *Gardeley* compelled it to hold such evidence admissible. The court did not attempt to reconcile this conclusion with the fundamental rule that cases are not

authority for questions they do not consider.  As the majority does here, the court simply cited *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).  (*Hill*, *supra*, at pp. 1127-1128; maj. opn. at p. 44.)  The rule of *Auto Equity* is that "[u]nder the doctrine of stare decisis, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction." (*Auto Equity*, *supra*, 57 Cal.2d at p. 455.)  To apply this rule, however, we must first identify the "decision" embodied in a cited precedent.  " 'The doctrine of precedent, or stare decisis, extends only to the ratio decidendi of a decision, not to supplementary or explanatory comments which might be included in an opinion" (*Gogri v. Jack in the Box Inc.* (2008) 166 Cal.App.4th 255, 272.)  " 'To determine the precedential value of a statement in an opinion, the language of that statement must be compared with the facts of the case and *the issues raised*.' [Citation.]" (*Ibid*., italics added.)  The application of the confrontation clause to testimonial basis evidence was not among the "issues raised" in *Gardely*.  The "decision" in that case therefore cannot extend to that question.

Since no binding paramount authority yet exists on the question before us, our duty is to ascertain as best we can the contours and boundaries of the competing legal principles at stake.  I believe at least five members of the United States Supreme Court would agree with me that the rationale on which California courts have routinely allowed gang experts to regurgitate prejudicial testimonial hearsay without let or hindrance cannot be reconciled with the federal constitutional right to confront one's accusers, as that right has been redefined by *Crawford v. Washington* (2004) 541 U.S. 36, and its progeny.  In *Williams v. Illinois* (2012) ___ U.S. ___ [132 S.Ct. 2221] (*Williams*), four members of the court denounced the "not for the truth" rationale, in dissent, as "a prosecutorial dodge." (*Williams*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2265 (dis. opn. of Kagan, J.).)  They quoted at length from a treatise describing that rationale as " 'very weak,' 'factually implausible,' 'nonsense,' and 'sheer fiction.' " (*Id.* at p. 2269., quoting D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence § 4.10.1, pp.

2

196–197 (2d ed.2011); *id.*, § 4.11.6, at 24 (Supp.2012).)  A fifth member of the court substantially agreed with this characterization, citing the same text, but joined with the other four members of the court to form a plurality on the ground that the laboratory report there at issue did not satisfy his unique test for what constitutes a " ' "testimonial" ' " statement triggering a right to confrontation.  (*Williams*, *supra*, ___ U.S. at pp. ___, ___ [132 S.Ct. at pp. 2255, 2257] (conc. opn. of Thomas, J.).)  Moreover at least one other member of the plurality wrote separately to the effect that he believed the result there was mandated by the peculiarities attending *scientific* evidence of the type there at issue—a concern that is entirely lacking when the challenged evidence consists of statements gathered by officers of the state from gang members and other witnesses.

Indeed, the main opinion in *Williams* leaves room for doubt that *any* member of the court would countenance the current wholesale use of gang experts by California prosecutors as conduits for hearsay collected by police in anticipation of gang prosecutions and allowed into evidence on the rationale that it may only be considered for such illumination as it may shed on the expert's opinion testimony.  All of the members of the court seemed to agree that such evidence can shed *no* light on an expert's opinion unless it is found to be true.  The lead opinion emphasized the safeguards restricting the admission and consideration of such evidence under federal rules, and state rules echoing them.  But California is not one of those states.  And under our current practice, incriminating extrajudicial assertions are typically admitted with *no* clear instruction either that the jury find them established by independent evidence or that it disregard them if not so found.  The jury is in effect told, "Here is a great deal of inflammatory evidence which you cannot consider for its truth but which, if true, may be considered as supporting the expert's opinion.  Make of it what you can."  Such a rule might have provoked a good deal of risible satire from a Lewis Carroll, Franz Kafka, Charles Dickens, or Mark Twain.  But I would only lend my signature to it under the constraint of paramount authority.  In the absence of such authority, I would hold that the trial court's

wholesale admission of incriminating testimonial hearsay in the guise of "basis evidence" was error.

Given that conclusion, the question becomes whether the admission of this evidence was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) I cannot say that it was, particularly with respect to defendant Domingo Rojas. At the time of the offense, he was 33-1/2 years old, with no prior felonies and, so far as the record shows, no history of gang involvement. It was stipulated that he had no tattoos on his body. While a jury might well have found that he possessed and discharged a firearm, I am far from confident that it would have found any gang-related purpose for his conduct without the inflammatory testimonial hearsay introduced through the expert. The effect of that finding was to elevate the punishment for his conduct from a seven-year maximum (Pen. Code, § 246) to a life sentence (*id.*, § 186.22, subd. (b)(4)). Whether the challenged evidence so tainted the proceedings as to render the judgment reversible in its entirety is a difficult question which I need not reach. I would reverse the judgment at least with respect to the gang enhancement, and to that extent I respectfully dissent.

 

_____
RUSHING, P.J.

4